(60 South. 363.)

No. 19,006.

AKERS v. IBERIA CYPRESS CO., Limited.

(Dec. 16, 1912.   Rehearing Denied Jan. 6, 1913.)

*(Syllabus by Editorial Staff.)*

1. TRESPASS (§ 43*)—EVIDENCE OF POSSESSION —SUFFICIENCY.
   In an action for cutting timber, based on possession and not on title, proof of constructive possession arising from title was not sufficient, since the title, not being involved, was not provable.
   [Ed. Note.—For other cases, see Trespass, Cent. Dig. §§ 102–111; Dec. Dig. § 43.*]

2. TRESPASS (§ 20*)—POSSESSION—SUFFICIENT TO SUPPORT ACTION.
   Possession or the right of possession apart from title is sufficient to support an action of trespass for cutting timber.
   [Ed. Note.—For other cases, see Trespass, Cent. Dig. §§ 32–47; Dec. Dig. § 20.*]

3. TRESPASS (§ 46*)—EVIDENCE—WEIGHT AND SUFFICIENCY.
   In an action for cutting timber on swamp lands, where plaintiff relied on possession and not on title, evidence *held* to show that his possession was more imaginary than real, and hardly of a character to attract attention, and hence was insufficient where defendant during the same time had been cutting timber on the premises practically continuously.
   [Ed. Note.—For other cases, see Trespass, Cent. Dig. §§ 123–127; Dec. Dig. § 46.*]

4. TRESPASS (§ 46*)—EVIDENCE—WEIGHT AND SUFFICIENCY.
   In an action of trespass for cutting timber, evidence *held* insufficient to show an acknowledgment by defendant of plaintiff's title to the land involved.
   [Ed. Note.—For other cases, see Trespass, Cent. Dig. §§ 123–127; Dec. Dig. § 46.*]

5. TRESPASS (§ 20*)—POSSESSION—SUFFICIENT TO SUPPORT ACTION.
   Possession of part of plaintiff's land, with title to the whole, was insufficient to support an action for trespass where defendant, claiming title to the land involved, was also in possession of part of his land purchased at the same time, especially where the land involved only joined plaintiff's other lands at the corner.
   [Ed. Note.—For other cases, see Trespass, Cent. Dig. §§ 32–47; Dec. Dig. § 20.*]

131 LA.—27

Appeal from Nineteenth Judicial District Court, Parish of Iberia; James Simon, Judge.

Action by J. C. Akers against the Iberia Cypress Company, Limited.   Judgment for defendant, and plaintiff appeals.   Affirmed.

Weeks & Weeks, of New Iberia, for appellant.   Burke & Burke and Ventress J. Smith, all of New Iberia, for appellee.

PROVOSTY, J.   The plaintiff alleged that he was owner of the N. W. ¼ of the N. W. ¼, and the S. W. ¼ of the N. E. ¼ of section 21, township 12 south, range 8 east, parish of Iberia, and that the defendant company, although well knowing that said land belonged to him and was in his possession, cut upon, and floated from it, in 1908, $4,000 worth of timber, and converted same into lumber worth $10,000; and plaintiff prayed that the defendant be condemned to pay him $10,000, the value of said lumber made out of said timber, or, in case he was entitled only to the value of the timber, then $4,000.

Defendant excepted that plaintiff's petition was vague in that it left it uncertain whether plaintiff's action was based upon ownership, or merely upon possession.

After this exception had been tried and submitted, but before it had been decided, plaintiff amended his petition by alleging distinctly that he was in possession of said land and timber, and that the trespass of defendant company was a disturbance of his possession.

. The defendant then filed a general denial and a special denial that plaintiff had possession of this land at the time the timber was taken.

On the trial the court, on exception made by plaintiff, ruled out all evidence of title, except in so far as tending to show possession.

[1] The case has therefore to be dealt with as not involving title, but merely possession. Notwithstanding this, the learned counsel for

plaintiff argue that plaintiff has shown title, and thereby constructive possession, and that this alone, without proof of actual possession or occupancy, is sufficient to serve as a basis for the present action of trespass.

In this contention, the learned counsel lose sight of the fact that title must first be established before constructive possession can result from it, and that title cannot be established in a suit like the present where inquiry into title is not possible.

[2] Defendant, on the other hand, contends that mere possession, or the mere right of possession, apart from title, cannot serve as the basis for an action to recover by way of damages the value of a thing of the possession of which the plaintiff has been deprived.

This court has decided differently. Smith v. Grant Timber Co., 130 La. 471, 58 South. 153.

For showing possession, plaintiff relies greatly upon the fact that in 1908, at the time of the alleged trespass, he was claiming title to the land in question, and had been doing so since 1892, and had all this time had a duly recorded title to this land.

But defendant offsets this claim by setting up a precisely similar claim.

[3] The acts of possession relied upon by the parties respectively can better be weighed if the following is kept in mind, to wit: That the lands consist of two small 40-acre squares, miles out in a low cypress swamp out of which it is possible to remove timber only in those years when the water is high enough in this swamp for floating the timber; that, while the deadening and trailing of the timber and the opening of float roads is usually done in the summer, fall, or winter, the floating is always in the spring; that the lands in dispute adjoin large tracts owned by the parties respectively, the plaintiff owning the lands adjoining the N. W. ¼ of the N. W. ¼ on the south, and the defendant those adjoining it on the other three sides, and the plaintiff owning those adjoining the S. W. ¼ of the N. E. ¼ on the south and west, and the defendant company owning those adjoining it on the north and east; and that both parties have admittedly been deadening, trailing, and floating timber upon and from these adjoining lands more or less continuously all the time.

For showing actual possession, plaintiff has to rely mainly on his own testimony. More disconnected scattering testimony than his it would be hard to imagine. If designedly given in that manner for the purpose of being confusing, it could not be more so. Stating in some sort of order the 36 typewritten pages of it which we have in the record, it is as follows: That he (plaintiff) purchased the land in dispute in partnership with one Warren in 1892, and so held it until 1894, when Warren sold out his half interest to him. That during the existence of the partnership, Warren attended to the work in the swamp. That he himself was at that time, and until June, 1902, the local agent of the Southern Pacific Railroad, and was a slave to his work, with no opportunity to look after his swamp lands, except occasionally when he would obtain leave of absence. That during the existence of the partnership he visited the lands (how many times, he does not say) and saw their men at work and trees in process of removal all over them. That the boundary lines were at all times well marked by blazes on the trees and a diamond A on the corner trees, and that the corner trees had on them an additional mark in the shape of a hat, which one of his foremen had had the fancy to cut on them. (By a diamond A is meant an A within a square or rhombus.) That he has floated thousands of logs from his 562 acres, the most of them since 1893, and that he has at all times "been in sufficiently close touch to the land to keep them from taking timber off it." That there were float roads on the lands, "and main

roads were leading to them for me and my neighbors passing through." That timber is usually deadened in the fall of the year, preparatory to floating it out in the spring, when the water comes. That he floated out in the spring of 1894 a lot of timber which Warren had deadened on their lands in 1892. That during that floating season, as he was going over his lands, showing the lines to his foreman, he came across men who were floating timber off of his lands under direction of one Mestayer, and he threatened Mestayer with criminal prosecution, and Mestayer sought to excuse himself on the plea of mistake. That Mestayer was working for the Breaux-Renaudet Lumber Company, and this company, defendant company's author in title, paid him $6.50 per thousand for 52 trees which Mestayer had taken on that occasion. That he is not certain that all of these 52 trees came from the land in dispute, but that he is certain that some did. That in 1897 and 1898 he cut and floated out a large lot of logs, and sold them to the Planters' Lumber Company, of which Mr. Dallas, the manager of the defendant company was the manager. That some of this timber had been deadened two or three years previously, and had been cut in 1895, 1896, and 1897. That he knows from what his foreman told him that some of this timber had come from the land in dispute. That in 1902 and 1903 he had a crew of men working in this swamp, and had two men to continue this work during the winter of 1903 and the summer of 1904. That they cleared float roads and cut down trees, mostly on section 28, but some on the land in dispute. That he himself frequently went to where they were working. That in 1904 he sold 150 trees to H. Shelby Sanders, some of which had been floated out in 1902 and 1903. That in 1904 ("according to the best of his memory") he discovered that one Shadel, working for the defendant company, had deadened 400 trees on the N. W. ¼.

That he took (when, he does not say) these trees, and paid nothing to Shadel or to the defendant company for the expense of deadening them. That Shadel said he had gone beyond the defendant company's line by mistake. That in 1905 he sold 161 trees at one time, and 82 at another, to the Planters' Lumber Company, some of which, his foreman told him, came from the land in dispute. That in 1906 he went upon the S. W. ¼ of the N. E. ¼ while his men were floating from it, and that in May of that year, while he was showing his lines to his newly employed foreman, Henry Green, he saw where the same Shadel, working for the defendant company, had floated off six of his trees from the N. W. ¼ of the N. W. ¼ of 21, and about an hour later he met Shadel with a survey party on the line between S. E. ¼ of the N. W. ¼ and S. W. ¼ of N. E. ¼—that is to say, a quarter of a mile within the body of his land—and that the men said they had been surveying for the defendant company, and he informed them that the land was his, and mentioned to Shadel the removal of the six trees, and Shadel promised to have them put back. That Shadel failed to do so, and he wrote him the following letter.

"Jeanerette, La., May 12th., 1906.
"Mr. H. H. Shadel, New Iberia, La.
"Dear Sir: I thought we made a solid compact at the time I met you in my float road last Monday that neither of us would touch the timber of the N. W. ¼ of N. W. ¼ or the other 3¹/₁₆ sections you told me your people claimed, and I was therefore very greatly surprised yesterday to find that the six or eight trees you had cut off the N. W. ¼ of N. W. ¼, section 21, and left in float roads had been moved. I want to say to you that this is not good business. Its not square and does not keep faith with a (as I termed it) sound business promise. You will hear from me in a more substantial manner later.
"Yours sincerely,      J. C. Akers."

That he received the following answer to this letter:

"New Iberia, La., May 14, 1906.
"Mr. J. C. Akers, Jeanerette, La.
"Dear Sir: Your letter of the 12th addressed to Mr. H. H. Shadel, referred to us, and we

see no reason why you should write as you do until you have investigated a little further to see whether or not Mr. Shadel was guilty of a breach of trust. This is to advise you that the few trees mentioned by you were moved by one of Mr. Shadel's men through mistake, and they can now be found not far where you saw them, and you can take possession of them at any time that you choose.

"This we think will put an end to the matter for the time being.

"Yours truly,

"The Iberia Cypress Co., Ltd.,

"Per G. W. Dallas, Manager."

That, having in the meantime discovered that the defendant company had floated considerable timber from his lands (he does not say whether from the lands in dispute or other lands), he wrote the defendant the following letter:

"Baton Rouge, La., May 30, 1906.

"The Iberia Cypress Co., Ltd.

"Gentlemen: Referring to your letter of 14th, I beg to notify you that the six cypress logs run back into my float road on section 21 near Bayou Boutte are not by any manner of means accepted as a settlement for the timber cut by these men from my lands. After a further examination I find that they have floated considerable timber from my land, an accounting for which I shall cause to be had at my convenience later.

"Yours truly,                    J. C. Akers."

That to this letter he received no answer. That in this year (1906) he sold 972 trees to the Renaudet Lumber Company, some of which, his foreman Paul Moreau told him, had come from the land in dispute. That in this year (1907) this foreman Paul Moreau worked on N. W. ¼ of N. W. ¼. He does not say what this work consisted of, nor whether he is speaking from his own knowledge. That in June, 1908, he sent his foreman Paul Moreau and a crew to cut and float timber from section 21, and this foreman came and told him of the trespass for which the present suit has been brought. That he went out there and came upon a colored man, named Horace Freeman, at work on the S. W. ¼ of N. E. ¼, who said he was working for Mr. Jacobs, the foreman of defendant company, and had been told,

to so inform plaintiff in case plaintiff sought to interfere with him. That the timber for which the present suit is brought had then been about all removed; but that defendant company continued with its work of taking the timber. That he does not know when this timber had been deadened. That since the bringing of this suit he has been working his swamp lands without interference from any one. Plaintiff produced the receipts and other papers showing the sales of timber to which he testified.

This testimony of plaintiff's, in so far as purporting to be based upon personal knowledge, amounts to but very little apart from the acknowledgments of plaintiff's title, said to have been made by Mestayer and Shadel, and by the defendant company itself. Summarized, it is that the boundary lines and corners of the land were at all times distinctly marked; that during the existence of the partnership plaintiff visited their partnership lands and saw men at work and trees in process of removal all over them; that he has floated thousands of logs from his lands; that in 1902, 1903, and 1904 he had a crew of men working on his lands, mostly on section 28, but some on the land in dispute; that in 1904 he discovered where Shadel had deadened 400 trees on N. W. ¼ of N. W. ¼, and that Shadel pretended to have deadened these trees by mistake; that in 1906 he went upon the S. W. ¼ of the N. E. ¼ while his men were floating from it; that in May of that year he discovered that Shadel had removed trees from N. W. ¼ of N. W. ¼, and that these trees were returned to him; that in 1907 his foreman, Paul Moreau, worked on N. W. ¼ of N. W. ¼ (whether he knows this of his own knowledge, does not appear); that in 1908 he saw where the trespass for which the present suit has been brought had been committed.

A witness named Frank Vilce, who was

cook at plaintiff's camp in 1902 and 1903, and was a laborer for plaintiff in 1903, 1904, 1905, and 1907, says that he did not work upon the lands in dispute, except that in 1907 he cut some timber on S. W. ¼ of N. E. ¼ of 21. Asked how much, he answered: "About 25 or 30 trees. About 20 trees." He also says that he "worked some" on the N. W. ¼ of the N. W. ¼. What the work consisted of, and when it was done, he does not say. He says that while he was cook he carried their dinners to the workmen in the swamp, and knows in that way, and is positive, that some timber was cut at that time by plaintiff's men on S. W. ¼ of N. E. ¼.

Plaintiff's foreman, Paul Moreau, testified that in 1907 he lived at a camp one mile from the land in dispute; that he that year reblazed the lines, and floated out for plaintiff 600 trees, all of which came off of section 21, except about 75 which came off of section 28. As to how many came off of the land in dispute he testified as follows:

"Q. About how many trees? A. I cannot tell you. Q. About how many? A. I never kept special account. Q. Give me an idea, 2, 10, 100, or whatever it is on either of those two tracts? A. On the 40 marked No. 2 on the sketch 'Y,' I know positively I got 75 to 100 pieces. Q. And on the other piece marked No. 1? A. That is what I was going to say; I don't know how many, I got some. Q. About how many? A. I could not say. Q. How long did it take you to take the timber off of No. 1? A. I never kept a record of it. Q. How long did you work there? A. I don't know. Q. How long on No. 2? A. I worked probably here to-day, and the next day I probably changed my crew. Q. How long do you think were you on No. 2. in 1907? A. I don't know. Q. The timber that you picked up there in 1907 was timber that had been deadened and trailed by some one, and you don't know who? A. I never asked. Mr. Akers said it was his land. Q. In other words, you went there after some one had done the preliminary work and you picked up what remained there after Mr. Akers ordered you to do so? A. Yes, sir; that is what I did, and it was his land. Q. Did you take you as much as one week to do that work? A. I have kept no record of that. Q. Did it take you two weeks? A. I don't know. I cannot answer that. Q. Do you think you could have done the work in a week's time? A. Not unless I had had a large crew. I usu-

ally used three or four men. Q. What crew did you usually use? A. It depends on the amount of work you have."

Two other witnesses for plaintiff, Henry Green and Sims Henderson, testify to plaintiff's having cut and removed trees from his swamp, but cannot say whether it was on the land in dispute, except that Henderson removed for plaintiff the same six trees with reference to which the agreement with Shadel was entered into.

Our conclusion from the foregoing is that plaintiff has abundantly established that in the 15 years from 1892 to 1907 he operated more or less extensively in his swamp, and that the boundary lines of his lands, including the land in dispute, were more or less marked by blazes on the trees, but that plaintiff's operations on the land in dispute, for all that appears, may well have amounted to very little, hardly of a character to attract attention. The very fact that the operations conducted by Mestayer and Shadel escaped plaintiff's attention, although these operations were on a large scale and extended from one year to another, and even over several years, would go to show that plaintiff's possession was more imaginary than real. Defendant's witnesses testify to operations practically continuous, and we have no reason for not believing them, and they say that all during these operations they never saw nor heard of plaintiff or of his agents or of his laying claim to the land in dispute, except on the occasions mentioned by plaintiff. In other words, defendant has abundantly shown that while plaintiff's operations on this land, if any, were small and insignificant—such as might well escape attention or been clandestine—its own were such as could not possibly have escaped the attention of any one visiting these lands even at such long intervals as once a year. Indeed, so full and convincing is defendant's evidence that we feel justified in contenting ourselves with

this statement of our conclusion from it, and dispensing with a statement of the details.

[4] Plaintiff's learned counsel lay great stress upon the acknowledgment which they say the defendant company made of plaintiff's title. But, in the first place, how very improbable it is that the defendant company or its author in title, claiming title as they were doing to this land, should have thus complacently acknowledged plaintiff's title. And we accordingly find that Mestayer and Shadel give an entirely different version of the 52 trees and 400 trees episodes, and that the letter of defendant company, hereinabove transcribed, was very far from being intended by the writer of it to be an acknowledgment of plaintiff's title. Mestayer says that he cut the 52 trees on other lands than those in dispute, and cut them at the request of plaintiff, who refused to pay him for the work on the plea that his bill was overcharged. Mestayer is not discredited, and seems to be a man of some standing, having occupied the positions of police juror and parish assessor. The contradiction into which he, when being cross-examined by plaintiff's learned counsel, apparently involved himself is fully explained by the testimony of the surveyor Gutecunts, who said that the lines he showed Mestayer on the occasion of the survey made for him were those of the land in dispute, as stated by Mestayer. Shadel testified that the deadened trees which were abandoned to plaintiff were some 300 trees which, by the survey in question, had been shown to be on the land of plaintiff, but not on the land in dispute. So much for the Mestayer and Shadel acknowledgments. The hereinabove transcribed letters had reference exclusively to the agreement between plaintiff and Shadel that the six trees should remain where they were. Plaintiff's letter to Shadel was that Shadel had violated this "solid compact" by removing the trees, and that this was a breach of faith. The defendant company answered that plaintiff was attributing to bad faith what had been the result of mistake, and that plaintiff was welcome to take these six trees. The letter concludes:

"This, we think, will put an end to the matter for the time being."

In other words, that these six trees were not worth fussing over, and that the matter of the title could be taken up later. And this seems to have been done, for on June 11, 1906, 30 days later, the defendant company wrote plaintiff:

"In compliance with your request of yesterday, will advise that our records show that we have title to the following lands in section 21, township 12 south, range 8 east, viz.: N. ½ of N. W. ¼, S. W. ¼ of N. E. ¼, N. W. ¼ of S. E. ¼."

That is to say, the lands in dispute.

Plaintiff invokes the principle that possession of part with title to whole is possession of whole.

[5] In doing so, plaintiff forgets that defendant is in a position to invoke the same principle, and with better reason since defendant acquired its other land as one body with the land in dispute, whereas the only land acquired by plaintiff at the same time as the land in dispute is the N. E. ¼ of the S. E. ¼ of section 21, which does not adjoin at all the N. W. ¼ of N. W. ¼ and can hardly be said to adjoin the S. W. ¼ of the N. E. ¼, since the two squares touch only at one of their corners.

We conclude with the learned trial judge that plaintiff failed to prove possession.

Judgment affirmed.

The CHIEF JUSTICE takes no part.